AFFIDAVIT

I, Thomas Brian Andersen, Jr., a Special Agent with Immigration and Customs Enforcement ("ICE"), in Boston, Massachusetts, being duly sworn, depose and state:

1. I am employed by ICE as a Special Agent and am assigned to the National Security Group of the Boston Office. I have been a Special Agent of ICE for over two years. I also have law enforcement experience from previous employment as a full time Vermont law enforcement officer for five years, and part time for three years, including over two years as a detective. In my current assignment, I am involved inter alia in investigations and prosecutions of human rights violators who have unlawfully sought refuge in the United States.

2. The information contained in this affidavit is based upon my interviews of witnesses, a review of statements of witnesses or reports of others who conducted interviews, discussions with other agents who conducted interviews, my review of records and documents related to this investigation, as well as personal observations or reports of the observations of other agents. In addition, I have read public source materials concerning the 1994 genocide in Rwanda, including, but not limited to, firsthand accounts and testimony at public trials, and have had discussions with experts on the subject. It does not, however, include all the information known to me or other agents with respect to this investigation, but only that

information which is necessary to establish the requisite probable cause.

3. I am submitting this affidavit in support of a criminal complaint charging PRUDENCE KANTENGWA, a/k/a PRUDENTIENNE KANTENGWA ("KANTENGWA"), with two counts of violation of Title 18, United States Code, Section 1546(a). KANTENGWA committed said offenses as follows:

   a. on or about January 29, 2004, KANTENGWA did knowingly utter, use and possess a document prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, that is, a Non-Immigrant Visa, by which the defendant entered the United States at Boston, Massachusetts, knowing it to have been falsely made and procured by means of false claims and statements, and to have been otherwise obtained by fraud and unlawfully obtained; and

   b. on or about March 8, 2004, in the District of Massachusetts, KANTENGWA did knowingly make under oath, and did knowingly subscribe as true under penalty of perjury under 28 U.S.C. § 1746, a false statement with respect to a material fact in an application and document required by the immigration laws and regulations prescribed thereunder, that is, a Form I-589, Application for Asylum and Withholding Removal, by which the defendant applied to remain in the United States and avoid removal, and did knowingly present such application and document which contained a false statement.

### The Rwandan Genocide

4. Between April and July of 1994, in the small African country of Rwanda, over 800,000 Tutsis were killed - most using clubs and machetes.

5. Rwanda is one of the smallest countries in Central Africa, with just 7 million people, and is comprised of two main ethnic groups, the Hutu and the Tutsi. Although the Hutus

account for 90 percent of the population, in the past, the Tutsi minority was considered the aristocracy of Rwanda and dominated Hutu peasants for decades, especially while Rwanda was under Belgian colonial rule. Following independence from Belgium in 1962, the Hutu majority seized power and reversed the roles, oppressing the Tutsis through systematic discrimination and acts of violence. As a result, over 200,000 Tutsis fled to neighboring countries and formed a rebel guerrilla army, the Rwandan Patriotic Front ("RPF").

6. In the early 1990s, the RPF invaded Rwanda and forced Hutu President Juvenal Habyarimana to sign accords that mandated that the Hutus and Tutsis share power. These accords, which were negotiated between July 1992 and June 1993, were signed in Arusha, Tanzania, and came to be known as the Arusha Accords. Pursuant to the Accords, Habyarimana's party, the Mouvement Revolutionaire pour le Developpement ("MRND"), was forced to share power with several more moderate parties, as well as those that represented the RPF.

7. A United Nations peacekeeping force of 2,500 multinational soldiers was dispatched to Rwanda to preserve the fragile cease-fire between the Hutu government and the Tutsi rebels. Peace was threatened by Hutu extremists who were violently opposed to sharing any power with the Tutsis. Among these extremists were those who desired nothing less than the actual extermination of the Tutsis. It was later revealed they

had even drawn up lists of prominent Tutsis and moderate Hutu politicians to kill, should the opportunity arise.

8.  In April 1994, Rwandan President Habyarimana attended talks with other African leaders in Tanzania.  On April 6, while returning from one such meeting, the Rwandan's president's plane, which was carrying President Habyarimana and Burundi's new president, was shot down by ground-fired missiles as it approached Rwanda's airport at Kigali, killing both men.  Immediately after these deaths, Rwanda was plunged into political violence as Hutu extremists, who dominated the interim government, began targeting prominent opposition figures who were on their death lists, including moderate Hutu politicians and Tutsi leaders.  Included among those killed were government ministers who were opposed to the extremists.

9.  The killings spread throughout the countryside as Hutu militia, armed with machetes, clubs, guns and grenades, began indiscriminately killing Tutsi civilians.  All individuals in Rwanda carried identification cards specifying their ethnic background, a practice left over from colonial days.  These "tribal cards" now meant the difference between life and death.  Road blocks were set up by the militia all over the country.  Those identified as Tutsis were killed.

10.  The Hutus engaged in genocidal mania, clubbing and hacking to death defenseless Tutsi families with machetes everywhere they were found.

11. The killings ended only after armed Tutsi rebels, invading from neighboring countries, managed to defeat the Hutus and halt the genocide in July 1994. By then, over one tenth of the population, an estimated 800,000 persons, had been killed.

**The Defendant KANTENGWA and her Husband Athanase Munyemana**

12. PRUDENCE KANTENGWA is from Byumba, which is a prefecture (or state) in the northern part of Rwanda. The vast majority of the Hutu elite, including the assassinated president, were from Byumba. After President Habyarimana (who had signed the Arusha Accords) was assassinated, the members of the MRND (the ruling Hutu party) seized all power and ousted the ministers of the other parties. The prime minister, who was a member of the RPF Tutsi Party, was murdered. KANTENGWA was married to Athanse Munyemana, who was a minister in the extremist Hutu government. He and KANTENGWA were members of the MRND Party. Munyamena, while not a cabinet minister, was Director of Internal Security, known as the Service de Renseignment. KANTENGWA, who was a lawyer, worked at the government insurance company Sonarwa. She worked directly under Mathieu Ngirumpatse, who was the President of the MRND. He is currently on trial for genocide at the International Criminal Tribunal for Rwanda ("ICTR") in Arusha, Tanzania.

**KANTENGWA's 2001 Visa Application and Rwandan Questionnaire**

13. In October 2000 and September 2001, KANTENGWA, who had fled to Nairobi, Kenya, applied for a visa to travel to the

United States for a few weeks to attend a conference and meetings of a church in Texas. On each occasion her application was denied. After multiple denials, she completed a "Rwanda Questionnaire." The State Department required that the questionnaire be completed in full as part of all applications for non-immigrant visas submitted by Rwandan nationals born before 1981 who were applying outside of Kigali, Rwanda. In February 2002, her application for visa was granted. On January 29, 2004, using the visa, she arrived in the United States.

14. KANTENGWA provided false information as to material facts in the Rwandan Questionnaire that she completed and submitted in connection with a Non-Immigrant Visa Application. She possessed and used that visa in January 2004, when she gained entry to the United States.

15. The false information was as follows: In response to a question that asked, "Were you or any immediate family members (spouse, parents, siblings, children) ever a member of the Armed Forces of Rwanda (FAR), the army or militia force, the Gendarmerie, Police Communal, Service de Reseingnment, Presidential Guard, Interhamwe, PALIR, or ALIR. If so, please explain," KANTENGWA responded by writing "No." This information was false. KANTENGWA's husband was a member of the Service de Reseingnment; in fact, he served as its Director.

16. Additional false information was provided in response to a question that asked, "Were you or any of your immediate

family members (spouse, parents, siblings, children) ever members of a political party, particularly CDR (Coalition pour la Defense de la Republique) or MRND (Mouvement Revolutionaire pour le Developpement), organization (civil society), or association in Rwanda? If so, explain." KANTENGWA responded by writing "No." This information was false, because both KANTENGWA and her husband were members of the MRND.

### Possession and Use of Falsely Obtained Visa

17. On January 29, 2004, KANTENGWA was in possession of her falsely obtained visa; KANTENGWA used her falsely obtained visa when she entered the United States at Boston, Massachusetts.

### KANTENGWA's I-589 Application for Asylum and for Withholding of Removal

18. On March 8, 2004, KANTENGWA signed and submitted an Application for Asylum and for Withholding of Removal, Form I-589. In this document, KANTENGWA contradicted some of the answers described above in other filings with U.S. immigration. For example, in 2004, in the Form I-589, she stated: "I was a member of MRND (Mouvement Revolutionaire National pour le Developpement), the ruling party before the war of 1994. I also accompanied my late husband in the party's public rallies." In fact, she based much of her fear of persecution on this relationship she and her husband had to the former government; KANTENGWA claimed that the present Rwandan government would harm her because of that connection and in order to get information from her (that they believed she possessed).

19. She also made false statements on her Asylum Application in response to a question that asked, "Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?" KANTENGWA responded by putting an "X" in the box indicating "No." This statement was false, in that, as set forth above, KANTENGWA had previously committed the crime of uttering, using and possessing a document prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, that is, a Non-Immigrant Visa, knowing it to have been falsely made and procured by means of false claims and statements, and to have been otherwise obtained by fraud and unlawfully obtained.

### Materiality of False Statements

20. I interviewed the consular officer who issued the Non-Immigrant Visa to KANTENGWA. She stated that the answers provided by KANTENGWA were material in the overall assessment of the visa application. She stated without hesitation that had she known the truth about the statements offered by KANTENGWA, she would have denied the visa application. In addition, based on my training and experience and conversations with other more experienced ICE Agents and employees of other divisions of the Department of Homeland Security, I know that questions on applications concerning previous criminal activity are material to the questioning and decision making of those who review

applications.

### Witnesses re: Membership in MRND

21. I interviewed two individuals who worked with KANTENGWA in 1994 in Kigali, Rwanda. At the time, KANTENGWA was employed by the Sonarwa Insurance Agency, as were the two individuals I interviewed.

22. The first individual ("W1") was shown a Rwandan passport photo (circa 1993) of KANTENGWA and was asked whether or not W1 recognized the person in the photo. W1 identified the subject as PRUDENTIENNE KANTENGWA and stated that KANTENGWA was a former employee of Sonarwa in the automobile claims department. W1 also identified a Rwandan passport photo of KANTENGWA's husband, Athanase Munyemana.

23. W1 stated that KANTENGWA was active in the MRND political party, as was her husband. While at work, KANTENGWA talked about keeping people in the MRND party (not allowing them to leave to other parties after the multi-party system was formed). KANTENGWA held and participated in MRND political meetings away from the office. KANTENGWA did not hide her feelings about the Tutsi. She was heard to say, "We (the MRND) must eliminate the Tutsis."

24. W1 stated that KANTENGWA was hired by Mathieu Ngirumpatse, who was the former leader of the MRND (and who is currently on trial at the ICTR for genocide).

25. The second witness ("W2") was also shown a Rwandan

passport photo (circa 1993) of KANTENGWA and was asked whether or not W2 recognized the person in the photo. W2 identified the person in the photograph as PRUDENTIENNE KANTENGWA and said that KANTENGWA used to work at Sonarwa in one of the automobile departments that handled transactions. W2 was also asked if W2 was familiar with KANTENGWA's husband. W2 said that W2 believed that KANTENGWA's husband worked for the former president of Rwanda in the security field.

26.  W2 stated that KANTENGWA was active in the MRND political party, as was her husband, who worked for President Habyarimana. Neither KANTENGWA nor her husband would have attained their positions, hers with Sonarwa, his with the president's office, unless they were active supporters of former President Juvenal Habyarimana.

27.  W2 stated that KANTENGWA was close to other MRND members. KANTENGWA was definitely a member of the MRND but may have also been affiliated with the Hutu Power segment of the MDR party, which was the party that many Hutu extremists were associated with. W2 stated that KANTENGWA also discussed MRND activities at work.

28.  According to W2, it was clear from comments made by KANTENGWA that she was an MRND supporter and that she believed in the goals of the MRND (eliminate the Tutsis). KANTENGWA worked closely with the former director of Sonarwa, Mathieu Ngirumpatse, who was also the President of the MRND.

## Records from Rwandan Ministry of Labor

29. I also reviewed official records from the Rwandan Ministry of Labor concerning Athanase Munyemana. The file contains a certification from the Magistrate of the commune of Kibali of his marriage to Kantengwa (no first name given) of Byumba. Also included was a 1988 passport application identifying his wife as "Prudentienne Kantengwa."

30. In 1983, Munyemana was a prosecutor in the Public Prosecutor's Office. In 1984, by order of Juvenal Habyarimana, the president of Rwanda, Munyemana was transferred to the "Central Administration," Office of the Presidency (Central Office of Investigation), as a "Personal Assistant." In January 1987, he returned to the Public Prosecutor's Office, and in December he was appointed to the Central Office of Investigations. In 1989, he was appointed head of the Interpol Office in Rwanda.

31. Sometime in the 1990s he was assigned to the Prime Minister's Office, in the Department of Intelligence, in charge of the Interior Intelligence Division. He retained his title as a Deputy Prosecutor while serving as Director of Central Intelligence. An "Appraisal Report" for the period January 1 through December 31, 1993, identified his position as the Director of the Service de Renseignement (Director of Intelligence Service). The report stated that "Munyemana, Athanase is Head of the Interior Security Division," and it is

signed by the Chief of Staff to President Juvenal Habyarimana. There is a similar report for the period January 1, through December 31, 1994 (which includes the period of the genocide). In the 1994 report, it states that he "is in charge of the Interior Intelligence Division."

### Conclusion

32. Based on the information set forth above, I have probable cause to believe that, on two occasions, PRUDENCE KANTENGWA, a/k/a PRUDENTIENNE KANTENGWA violated Title 18, United States Code, Section 1546(a). In her Non-Immigrant Visa application, which she possessed and used in January 2004, she lied in response to direct questions when she failed to disclose that she and her husband were both members of the MRND party and failed to disclose her husband's membership in the Service de Renseignment. In addition, in her I-589 Asylum Application, which was signed by her in March 2004, she lied when she failed to disclose that she had previously committed a crime in the United States.

Thomas Brian Andersen, Jr.
Special Agent
Immigration and Customs Enforcement

Sworn to before me this 24 day of November 2008, under the pains and penalties of perjury, at Boston, Massachusetts.

Judith G. Dein
United States Magistrate Judge